IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                                             15-CR-4405 KG

JESUS ANTONIO BUSTILLOS-RAMIREZ,

        Defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER DENYING MOTION TO SUPPRESS

      This matter is before the Court on Defendant Jesus Antonio Bustillos-Ramirez's Motion to Suppress Evidence and Statements, filed on December 22, 2015. (Doc. 15). The United States filed a response on January 19, 2016. (Doc. 19).

      On February 9, 2016, the Court held an evidentiary hearing on the motion to suppress. (Docs. 38-39). Anna Wright and Luis Martinez represented the United States, and Caleb Kruckenberg and Bernadette Sedillo represented Defendant, who was present. At the conclusion of the presentation of evidence, the Court found, and Defendant conceded, that the search of the vehicle and seizure of the cocaine were lawful. (Tr.) at 167-69.[1] The Court finds and concludes for the reasons stated on the record that the motion to suppress is denied as to the search of the vehicle and the seizure of the cocaine. The Court also found that statements made by Defendant in response to officers' questioning during primary inspection and the initial secondary inspection while Defendant sat in the vehicle were obtained lawfully. (*Id.*) at 169. The Court,

---

[1] "Tr." refers to the transcript of the February 9, 2016, hearing on the motion to suppress. (Doc. 39).

therefore, finds and concludes for the reasons stated on the record that the motion to suppress is denied as to any responses elicited from Defendant during such questioning.

The United States conceded that any statements made once Defendant was handcuffed and placed inside a locked cell should be suppressed. (Doc. 19) at 11.

The Court requested additional briefing on the legal standard applicable to the statements made by Defendant while he sat at a table during secondary inspection. (Tr.) at 169-70. The Court then directed the parties to submit proposed findings of fact as to Defendant's Motion to Suppress. (*Id.*) at 171. The Court directed the parties to file their proposed findings of fact and briefing as separate documents.[2] (*Id.*) Based on a review of the additional briefing and relevant law, the Court denies the motion to suppress.

#### FINDINGS OF FACT

1. The United States called six witnesses who testified in support of these factual findings: Customs and Border Protection ("CBP") Officers Antonello Pastrone, Don Schaeffer, Gabriela Aguilera, Alberto Macias, and Robert Mata, and Homeland Security Investigations Seized Property Specialist David Barkley.

    a. CBP Officer Antonello Pastrone has been an officer with CBP for three years and stationed at the Santa Teresa, New Mexico, Port of Entry for two years. (Tr. 55-56). His duties include inspecting vehicles and people crossing into the United States from Mexico, and he inspects at least 100 vehicles each day. (*Id.*) at 57.

    b. CBP Officer Don Schaeffer has been an officer with CBP and stationed at the Santa Teresa Port of Entry for a little less than three years. (*Id.*) at 84.

---

[2] Defendant failed to file a response to the United States' supplemental briefing. However, Defendant included Proposed Conclusions of Law with his Proposed Findings of Fact. The Court will consider the law cited therein. (Doc. 57).

      Previously, Border Patrol and the Transportation Safety Administration employed him for one year each. (*Id.*) at 85.

   c. CBP Officer Gabriela Aguilera has been a CBP officer for a little over three years. (*Id.*) at 117. Her duties include inspecting vehicles crossing from Mexico. (*Id.*) at 117-18.

   d. CBP Officer Alberto Macias has been an officer with CBP for 10 years and has been stationed at the Santa Teresa Port of Entry for 18 months. (*Id.*) at 153. His duties include inspecting vehicles, and he inspects approximately one vehicle per minute when he is assigned to vehicle inspections. (*Id.*) Over his career, he has inspected thousands of vehicles. (*Id.*)

   e. CBP Officer Robert Mata has been an officer with the CBP and stationed at the Santa Teresa Port of Entry for nine years. (*Id.*) at 6. As part of his duties, he inspects approximately 200 vehicles a day. (*Id.*) at 7. Before joining CBP, he was employed with the military for seven years doing counter drug work; specifically, he dismantled vehicles that were found to contain contraband. (*Id.*) at 6-7.

   f. Homeland Security Investigations ("HSI") Seized Property Specialist ("SPS") David Barkley is tasked with taking care of property seized by HSI, as well as assisting during the execution of search warrants and at crime scenes. (*Id.*) at 41.

2. On October 4, 2015, at approximately 8:45 a.m., Defendant entered the United States at the Santa Teresa Port of Entry from Mexico as the sole occupant of a white, 2001 Jeep Cherokee. (*Id.*) at 58-59.

3. In primary inspection, Officer Pastrone questioned Defendant in Spanish. (*Id.*) at 59. Officer Pastrone is a native Spanish speaker and had no difficulties communicating with Defendant. (*Id.*) at 60.

4. While Officer Pastrone spoke with Defendant, Officer Pastrone stood about two feet away in a booth. (*Id.*) at 64. He was dressed in his CBP uniform and had his duty belt on, including his firearm and baton, which were visible to Defendant. (*Id.*) at 64-65. During his conversation with Defendant, Officer Pastrone never raised his voice, never told Defendant he was under arrest, and never acted in a way that Defendant could have perceived as threatening. (*Id.*) at 65. During his conversation with Defendant, Officer Pastrone was the only officer present. (*Id.*)

5. Defendant presented a border crossing card issued on November 21, 2014, and when Officer Pastrone reviewed Defendant's crossing history, he discovered that Defendant had not crossed in the previous six months. (*Id.*) at 61, 68-70. This struck Officer Pastrone as unusual because, in his experience, people who have border crossing cards use them frequently, crossing as much as every day or multiple times a day. (*Id.*) at 61, 82. Officer Pastrone previously encountered other people who used their border crossing cards infrequently and who later turned out to be drug load drivers. (*Id.*) at 61.

6. Officer Pastrone asked Defendant what his purpose was in coming to the United States, whether he brought any cash with him, whether he owned the vehicle, and whether he was responsible for the contents of the vehicle. (*Id.*) at 61-63. Defendant told Officer Pastrone that he was going shopping to buy some tools. (*Id.*) at 61. Defendant declared $400 in United States currency and said that he borrowed the Jeep from his brother-in-law but that everything in the Jeep belonged to him. (*Id.*) When asked what kind of tools

he was going to buy and where he was going to buy them, Defendant remained silent. (*Id.*) at 61-62.  This struck Officer Pastrone as odd because he knew that Defendant could hear him and he had never before had someone remain silent when he asked a question. (*Id.*) at 81-83.

7. Officer Pastrone then referred Defendant to secondary inspection. (*Id.*) at 65, 87.  The secondary inspection area is positioned 50 yards beyond the primary inspection area and consists of lanes with tables next to them. (*Id.*) at 66.  Officer Pastrone met Officer Shaeffer, who was working at the secondary inspection area, half-way between the primary and secondary inspection areas. (*Id.*) at 73.  He handed a referral slip to Officer Schaeffer that indicated that Defendant had no crossings, $400 in cash, and did not know where he was going to buy tools. (*Id.*) at 66, 75-76.  Officer Pastrone also told Officer Schaeffer that Defendant did not give an answer when asked where he was going to buy the tools and what tools he planned to purchase. (*Id.*) at 66-67, 75, 80.

8. After Officer Pastrone referred Defendant to the secondary inspection area, Officer Pastrone returned to the primary inspection area and continued inspecting vehicles. (*Id.*) at 67.  His entire conversation with Defendant lasted two to three minutes. (*Id.*) at 74.

9. Officer Schaeffer then took a declaration in Spanish from Defendant, who was still in the vehicle. (*Id.*) at 90, 93.  Officer Schaeffer speaks Spanish as a second language, and his Spanish is limited. (*Id.*)  Sometimes he is not understood or has trouble understanding others when speaking in Spanish. (*Id.*) at 103.  During their conversation, Officer Schaeffer understood everything Defendant said. (*Id.*) at 114.

10. While he was taking Defendant's declaration, Officer Schaeffer was standing next to the driver's door, approximately two or three feet away. (*Id.*) at 93.  Officer Schaeffer was

wearing his CBP uniform, and his duty belt, including his gun, which was visible to Defendant. (*Id.*) at 93-94. Officer Aguilera was the only other officer nearby, and she was standing next to the rear door on the driver's side of the Jeep, which was about one to three feet behind Officer Schaeffer. (*Id.*) at 98, 104, 119, 122. While he was talking to Defendant, Officer Schaeffer did not raise his voice or do anything that Defendant could perceive as threatening. (*Id.*) at 98.

11. At the secondary inspection area, the CBP officer normally takes the vehicle keys from the driver, gets a declaration, and asks questions related to contraband, travel plans, and purpose in the country. (*Id.*) at 142-43. Officers also routinely conduct a seven-point inspection. (*Id.*) at 143. Officer Schaeffer did not remember seeing or taking custody of Defendant's phone or wallet. (*Id.*) at 104.

12. When asked by Officer Schaeffer, Defendant said that he was on his way from Juarez, Chihuahua, Mexico, to El Paso, Texas. (*Id.*) at 90. Defendant told Officer Schaeffer that he was going to El Paso to buy tools but he did not know where he was going to buy the tools. (*Id.*) at 91. He also said that he was not bringing anything into the United States, that he had $400 in cash with him, and that the Jeep belonged to his brother-in-law. (*Id.*) at 90-91.

13. When Officer Schaeffer asked Defendant if he was responsible for everything in the Jeep, Defendant said he did not understand. (*Id.*) at 91. This was the first time Defendant did not understand something Officer Schaeffer said to him. (*Id.*) at 92. Officer Schaeffer then asked Officer Aguilera to help with translation because she is fluent in Spanish. (*Id.*) at 92-93, 119-120.

14. Officer Aguilera described Officer Schaeffer's Spanish as "a bit confusing, 'cause it wasn't very clear." (*Id.*) at 119.

15. Officer Aguilera moved next to the driver's door and rephrased the question twice before Defendant said he was responsible for everything. (*Id.*) at 120-21. Officer Aguilera asked Defendant who the vehicle belonged to, and he said that it belonged to his uncle and that he had borrowed the Jeep to go shopping in El Paso. (*Id.*) at 121. When Officer Aguilera asked him what stores he was going to, Defendant said he did not know. (*Id.*)

16. Officer Aguilera told Defendant to step out of the vehicle, and instructed him to open the hood and trunk and to unlock the doors. (*Id.*) at 121-22. Officer Aguilera told Defendant that she was going to inspect his vehicle and, for officer safety, had Defendant sit, facing away from the Jeep, at a table between five to twenty feet away from the Jeep. (*Id.*) at 96, 104-06, 122, 124, 134. Officer Schaeffer kept watch over Defendant by standing about two to seven feet away from the table where Defendant sat. (*Id.*) at 97-98, 124. Defendant was not patted down, and he was not placed in handcuffs. (*Id.*) at 104-05, 124, 133.

17. At this point, if Defendant had tried to return to Mexico, Officer Schaeffer would have stopped him. (*Id.*) at 107-08, 155. Defendant could have attempted to flee into Mexico because the border is approximately 200 to 300 yards away and there are no barriers between the United States and Mexico. (*Id.*) at 101. Officer Schaeffer would not have allowed Defendant to leave the table to get a drink of water, but if Defendant had indicated he was thirsty, Officer Schaeffer would have asked another officer to bring him water. (*Id.*) at 108, 114. Defendant also would not have been allowed to go to the bathroom alone, but an officer would have escorted him to the bathroom. (*Id.*) at 155-56.

18. While Defendant sat at the table, Officers Aguilera, Cindy Aguayo, and Douglas Colton did a seven-point inspection of the Jeep, including inspecting the undercarriage using a mirror. (*Id.*) at 124-25. During the inspection, Officer Aguilera noticed two rails on the undercarriage running along the sides of the Jeep that were bigger than usual. (*Id.*) at 125. Because of the rails, the officers suspected that the Jeep might have a false floor. (*Id.*) at 126. Since he suspected the Jeep had a false floor, Officer Colton got permission from Officer Macias to drill a small hole in the floor of the Jeep. (*Id.*) He drilled the hole on the driver's side in the back near the rail. (*Id.*) at 126-27. The drill was about half the size of a standard pencil. (*Id.*) at 127. The officers did not find a false compartment under the floor. (*Id.*) at 127-28.

19. While the other officers were doing the seven-point inspection and drilling the floor, Officer Macias also noticed that the Jeep appeared to have been lifted. (*Id.*) at 143. He thought this odd because the Jeep was older. (*Id.*) at 144. Officer Aguilera then asked Officer Macias for permission to put the Jeep on a lift. (*Id.*) at 128. She drove the Jeep to the lift, and the Jeep operated without any problems. (*Id.*) Indeed, Officer Mata has never known a vehicle that was unable to operate after having the floor drilled. (*Id.*) at 34.

20. The Jeep was placed on the lift around 9:30 a.m. (*Id.*) at 158. The lift was about 20 to 30 yards away and out of Defendant's sight. (*Id.*) at 109.

21. Once the Jeep was raised, Officer Macias confirmed that a lift had been installed onto the Jeep. (*Id.*) at 145. Officer Macias also noticed other tampering with the vehicle, including alterations to the engine. (*Id.*)

22. While the Jeep was on the lift, Officer Aguilera returned to speak to Defendant. (*Id.*) at 130. Officer Schaeffer was standing nearby. (*Id.*) at 136. Officer Aguilera suspected that Defendant was not telling the truth because "nobody goes to a store and not know what store you're going to." (*Id.*) at 129. Officer Aguilera spoke to Defendant entirely in Spanish. (*Id.*) at 132. She was wearing her uniform, and her duty belt and gun were visible to Defendant. (*Id.*) at 122. Officer Aguilera did not raise her voice to Defendant or act in a threatening manner. (*Id.*) at 122-23.

23. Officer Aguilera suspected that Defendant might be coming to work illegally in the United States. (*Id.*) at 129-30. Consequently, she examined Defendant's wallet for an I-94 or notes relating to addresses in the interior of the United States. (*Id.*) Officer Aguilera did not find any evidence related to her suspicions. (*Id.*) at 130. She did not inspect Defendant's cell phone because she did not see it. (*Id.*) at 135-36.

24. Officer Aguilera asked Defendant what he was going to buy. (*Id.*) at 130. Defendant said for the first time that he was going to buy machinery to do sheetrocking because he worked for his uncle in Mexico. (*Id.*) at 130-31. Defendant did not specify the types of tools he intended to buy. (*Id.*) at 136. This struck Officer Aguilera as odd because, based on her experience working in a hardware store, she believed that there is no special machinery required to do sheetrocking. (*Id.*) at 131.

25. Officer Aguilera then relayed this information to Officer Macias. (*Id.*) She told Officer Macias that Defendant's story did not make sense, and Officer Macias then approached Defendant. (*Id.*) at 145. He spoke to Defendant in Spanish, and they had no problems communicating. (*Id.*) at 146. Officer Macias was wearing his CBP uniform, and his gun

9

was visible. (*Id.*) at 146-47. During their conversation, Defendant was relaxed, and Officer Macias did not act intimidating or threatening. (*Id.*) at 147.

26. Officer Macias asked Defendant who the Jeep belonged to, and Defendant said that he borrowed it from his brother-in-law and was going to buy tools for his uncle. (*Id.*) Defendant said that he did not know where he was going to buy the tools but added that he was supposed to drive to a "really good" hamburger place and wait for his uncle to call him. (*Id.*) He did not know the name of the hamburger place or where it was. (*Id.*) at 147-48. Defendant said that he was responsible for everything in the Jeep and that he was 100% sure there was no contraband in it. (*Id.*) at 148.

27. Officer Macias then returned to the Jeep and inspected it again because Defendant's story did not make sense. (*Id.*) at 148-49. This time, Officer Macias noted that the Jeep had a larger than usual oil pan and that the whole engine was altered to accommodate it. (*Id.*) at 149. This led him to believe that the oil pan contained contraband, so he had the Jeep partially lowered to about four or five feet off the ground so that a drug detection dog could inspect it. (*Id.*) at 149-50. The dog did not alert. (*Id.*) at 150.

28. At this point, Officer Macias decided that the oil pan should be removed for inspection and instructed Officer Schaeffer to detain Defendant. (*Id.*) at 99, 151-52. Officer Macias told Defendant that the officers were going to continue to inspect the Jeep, that he was not under arrest, and that he was going to be placed in a holding cell. (*Id.*) at 152. Officer Schaeffer handcuffed Defendant at about 9:40 a.m., and Officers Schaeffer and Macias patted down Defendant and placed him in a locked holding cell. (*Id.*) at 99, 102, 152, 158. The officers did not read to Defendant his *Miranda* warnings. (*Id.*) at 157-58.

At the time he was placed in the holding cell, Defendant had been waiting at secondary inspection approximately 30 to 45 minutes. (*Id.*) at 99.

29. The officers did not speak to Defendant again. (*Id.*) at 152-53.

30. After the dog failed to alert but while the Jeep was still up on the lift, Officer Mata inspected the Jeep's undercarriage. (*Id.*) at 10-15. Officer Mata conducts intrusive inspections of six to eight vehicles a day. (*Id.*) at 9. Intrusive inspections are those inspections that go beyond a mere visual inspection. (*Id.*) at 8-9. His inspections have never left a vehicle inoperable. (*Id.*) at 9.

31. At about 9:30 a.m., while the Jeep was raised on the lift and the oil pan was still attached to the Jeep, Officer Mata conducted another seven-point inspection. (*Id.*) at 12-13, 25. At the time, Officer Mata knew that the other officers had already conducted a seven-point inspection and confirmed that the floor was not loaded. (*Id.*) at 25-27. Officer Mata noticed that the muffler had weak weld marks, an unusually large oil pan, extensions on the muffler headers, screws with different bolts and nuts that were hand tightened, and poorly applied epoxy. (*Id.*) at 13-15. Officer Mata could not tell when the work had been done on the exhaust and oil pan but he could tell that the weld marks on the U-bolt, which hugs the exhaust, were fresh. (*Id.*) at 28, 34. He also noted that the U-bolt looked homemade. (*Id.*) at 34.

32. All this struck Officer Mata as unusual because it did not look like the work had been done by a regular mechanic. (*Id.*) at 14-15. Previously, Officer Mata had encountered vehicles that utilized oversized oil pans to conceal narcotics. (*Id.*) at 17. In his experience, oversized oil pans are loaded with narcotics 80% of the time. (*Id.*) at 22-23.

33. Because he suspected there might be contraband in the oil pan, Officer Mata removed the plug from the oil pan and drained the oil. (*Id.*) at 18. There were only approximately two quarts of oil in the pan even though it should have held approximately six quarts of oil. (*Id.*) Officer Mata drained the oil into a five gallon bucket so that he could pour the oil back into the vehicle later if it was not loaded. (*Id.*)

34. Once Officer Mata drained the oil, at approximately 9:40 or 9:50 a.m., Officer Mata inserted a scope into the oil pan through the drain hole. (*Id.*) at 19, 31-32. He could see nothing using the scope because oil clouded the lens. (*Id.*) at 19. He next inserted a probe through the drain hole and immediately felt what seemed to be bundles inside the oil pan. (*Id.*) Officer Mata could feel that the bundles were soft. (*Id.*) at 31. When he removed the probe, it pulled out little bits of plastic, which would not normally be found in an oil pan. (*Id.*) at 19-20. Once Officer Mata found plastic on the probe, he reinserted it and when he pulled it out, there was a white powdery substance on the end of the probe. (*Id.*) at 20. The probe was approximately 15 to 18 inches long and resembled a stereo antenna. (*Id.*) at 19.

35. Officer Mata then inserted a drill bit that was 5/8 of an inch in diameter and a foot long into a bundle in the oil pan. (*Id.*) at 20-21. When he pulled the drill bit out, there was a white powdery substance on the end of the drill bit. (*Id.*) at 22. Officer Mata then replaced the oil pan plug. (*Id.*) at 21.

36. The officers field tested the substance, which tested positive for the properties of cocaine. (*Id.*)

37. At no time prior to finding the cocaine did Officer Mata drill into the oil pan. (*Id.*) at 20-21. At all times, he utilized the pre-existing drain hole. (*Id.*) at 21. SPS Barkley later

inspected the oil pan and confirmed that there was no evidence it had been drilled into. (*Id.*) at 45-46.

38. A dismantler later came to the Santa Teresa Port of Entry and removed the oil pan. (*Id.*) at 24. Officers found approximately ten pounds of cocaine inside the oil pan. (*Id.*)

39. The Court finds the testimony from each of the Government witnesses credible.

## CONCLUSIONS OF LAW

1. Officers possess more latitude at the border in conducting searches and seizures than in other locations. "Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). That is, "border patrol agents may stop, briefly detain, and question individuals without any individualized suspicion that the individuals are engaged in criminal activity." *United States v. Massie*, 65 F.3d 843, 847 (10th Cir. 1995).

2. The obligation that officers administer *Miranda* warnings is only applicable in the context of "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

3. Not all seizures or detentions rise to the level of custody or arrest requiring a *Miranda* warning. "[A] fixed border checkpoint constitutes a Fourth Amendment seizure because a reasonable person would not believe []he is free to leave." *United States v. Hudson*, 210 F.3d 1184, 1190-91 (10th Cir. 2000) (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 556 (1976)). "However, 'a Fourth Amendment seizure does not necessarily render a person in custody for purposes of *Miranda*.'" *Id.* (quoting *United States v. Bengivenga*, 845 F.2d 593, 598 (5th Cir. 1988)).

4. The general standard for when a person is in custody for *Miranda* purposes is when a "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (quotation omitted).

5. However, at the border, whether an encounter is custodial "'must take into account the strong governmental interest in controlling our borders.'" *Hudson*, 210 F.3d at 1191 (quoting *United States v. Fernandez-Ventura*, 132 F.3d 844, 846 (1st Cir. 1998)). Therefore, at the border, "[t]he standard for determining whether a person is under arrest is not simply whether a person believes that he is free to leave, but rather whether a reasonable person would believe that he is being subjected to more than the temporary detention occasioned by border crossing formalities." *United States v. Bravo*, 295 F.3d 1002, 1009 (9th Cir. 2002) (quotation omitted). Further, "whether an individual is in custody depends upon the objective circumstances of the situation, or whether a reasonable innocent person in such circumstances would conclude that *after brief questioning he or she would not be free to leave*." *Id.* (quotations omitted). Such detentions are not equivalent to custody, "even though such persons are not free to leave or to refuse to be searched." *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001).

6. Courts look to the surrounding circumstances to determine whether a Defendant was in custody when responding to certain questions, including limitation on movement, the type of force used, language of the officers, the physical characteristics of the location where Defendant was questioned, the length of the detention, and the degree to which the Defendant was challenged with evidence of guilt. *Bravo*, 295 F.3d at 1009 n.4; *Butler*, 249 F.3d at 1099.

7. At a border stop, an officer may briefly ask individuals about topics such as "'vehicle ownership, cargo, destination, and travel plans, as long as the questions are reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband.'" *Hudson*, 210 F.3d at 1188 n.5 (quoting *Massie*, 65 F.3d at 847-48). When an agent notices "suspicious circumstances" during this questioning, he may question the motorist further. *Massie*, 65 F.3d at 848. "Border patrol agents have virtually unlimited discretion to refer cars to the secondary inspection area." *Massie*, 65 F.3d at 847.

8. Several border stop cases explore the boundary between routine border detentions and custody for *Miranda* purposes. In *Hudson*, the Tenth Circuit found that the defendant was not in custody when an agent took defendant and co-defendant to a location adjacent to the secondary inspection area and behind a brick/concrete barrier for questioning. 210 F.3d at 1187, 1193. The agent asked questions for eight to ten minutes regarding where the two were coming from, who they had been visiting, and where they were going, while other agents searched their vehicle. *Id.* at 1187. The agent then directed the two into a checkpoint trailer because it was cold outside. *Id.* at 1188. Defendant was not placed under arrest, handcuffed, or placed in a cell. *Id.* Not until agents discovered marijuana in the vehicle was he arrested, handcuffed, given *Miranda* warnings, and placed in a cell. *Id.* Until that point, the court found that "a reasonable person . . . would not have believed that []he was subject to the functional equivalent of a formal arrest." *Id.* at 1193.

9. In *Massie*, the Tenth Circuit reversed the district court's grant of a motion to suppress. 65 F.3d at 849. The court found that agents' questioning for eight to eleven minutes from

the time Defendants were stopped to when a dog alerted on their trunk in secondary was reasonable and that the questions were not overly intrusive because they dealt with citizenship, vehicle ownership, vehicle contents, destination, and travel plans. *Id.* Defendants appear to have been standing near their vehicle during the search and were not restrained. *Id.* at 845. The court found that the stop "did not exceed the scope of a permissible routine check point stop." *Id.* at 849.

10. In *Bravo*, the Ninth Circuit determined that the defendant was not in custody when he was handcuffed for one to two minutes for safety reasons to walk to a security office, where an agent then removed the handcuffs, frisked him, patted him down, and searched his shoes. 295 F.3d at 1009-12. The agent informed Bravo that the handcuffs were temporary and for Bravo's and the agent's safety and would be removed upon arrival at the office. *Id.* at 1011. The agent also told Bravo that he would be free to leave if nothing was found in his vehicle. *Id.* The court examined the totality of the circumstances and found that the handcuffs were justified in this situation due to the border being only twenty yards away, two border patrol agents having been shot in similar circumstances, a dog alerting to Bravo's vehicle, Bravo acting "overly friendly," and Bravo's toolbox appearing to have a hidden compartment. *Id.* at 1004, 1011. The court concluded that "the circumstances of Bravo's detention would lead a reasonable innocent person to believe that he would be free to go once the search was over and he answered any questioned." *Id.* at 1011. Officers later placed Bravo in custody, in a holding cell, once they found marijuana in the truck. *Id.* at 1005.

11. In *United States v. Doe*, 219 F.3d 1009, 1012, 1014 (9th Cir. 2000), the court found that the defendant was not in custody for purposes of *Miranda* when he was taken to a

security office, searched for weapons and contraband, and seated on a bench pending the results of a search of his truck.

12. In *United States v. Juvenile (RRA-A)*, 229 F.3d 737, 741, 743 (9th Cir. 2000), the court found that the defendant was not in custody when she was taken into an office and frisked during secondary inspection.  Not until agents found marijuana in the vehicle and handcuffed the defendant to a bench in a locked security office for four hours without *Miranda* warnings was she in custody because a reasonable person would not have believed that she was free to leave at that time.  *Id.* at 743.

13. In contrast, in *Butler*, the court upheld the district court's finding that the defendant was in custody while agents conducted an intensive inspection of his car.  249 F.3d at 1097, 1100-01.  During that time, an agent took Butler to the inspection station's security office, patted him down, placed him in a locked holding cell, and confiscated his shoes and belt.  *Id.* at 1097.

14. Similarly, in *United States v. Chavira*, 614 F.3d 127, 133-36 (5th Cir. 2010), the court found that the defendant was in custody when agents took her to a passport control secondary processing area, which was a windowless, secured trailer, and two to four agents questioned her for to forty minutes while she was handcuffed to a chair.  The court noted that Chavira's freedom of movement was severely restrained, and she was in a police dominated setting.  *Id.* at 134, 136.  The court stated, "[i]nterrogations in public settings are less police dominated than stationhouse interrogations; the public nature reduces the hazard that officers will resort to overbearing means to elicit incriminating responses and diminishes the individual's fear of abuse for failure to cooperate." *Id.* at 135.

15. Bustillos-Ramirez's time seated at the table presents a situation similar to those cited in which the courts found that the defendant was not in custody. Although Bustillos-Ramirez was not free to leave, the circumstances of the detention would lead a reasonable innocent person to believe that he would be free to go once the search was over and he answered any questions. Defendant remained in a public place, the officers acted in a non-threatening manner and asked about the vehicle and his travel plans, he was only detained at the table while the officers searched vehicle, and he was not restrained or locked up in any manner. Therefore, Defendant was detained while seated at the table, but he was not yet in custody for purposes of *Miranda*.

16. Based on the foregoing conclusions, the Court will not suppress Defendant Bustillos-Ramirez's statements made prior to or while seated at the table in secondary inspection. As noted, the United States conceded that any statements Bustillos-Ramirez made once he was handcuffed and placed inside a locked cell shall be suppressed. (Doc. 19) at 11.

IT IS THEREFORE ORDERED

that Bustillos-Ramirez's Motion to Suppress Evidence and Statements (Doc. 15) is DENIED.

_____
UNITED STATES DISTRICT JUDGE